## HOYT et al. v. J. T. LOVETT CO.

(Circuit Court of Appeals, Third Circuit. December 3, 1895.)

### No. 1.

1. TRADE-MARK—PRIORITY OF ADOPTION.

Complainants, who claimed the name "Green Mountain" as a trade-mark for a variety of grapevine raised and sold by them, had obtained the cuttings from which the vines were propagated from one P., in 1885, and after some years of experimental cultivation began to sell the vines, in 1889, under the name "Green Mountain." It appeared that P. had discovered the original wild vine in the Green Mountains, in 1884 or earlier, and in that year sent one of the vines to one H., in New York, with whom he had discussed the question of a name for the vine, and had settled upon "Green

Mountain," which name he attached to the vine sent to H.; that in 1885 he sent another such vine to H., who propagated vines from it to some extent, and sold them, under the name "Green Mountain," to various persons, including the defendant, who in turn propagated and sold the vines under the same name. *Held*, that complainants had not shown priority of adoption and use of the alleged trade-mark, though P., at the time he sold the cuttings to them, had agreed not to sell to any others, and had informed complainants that no vines had been sold which would interfere with them.

2. SAME—GEOGRAPHICAL NAME.

A geographical name, denoting the place of origin of the article to which it is given, as the name "Green Mountain Grapes," applied to grapes and grapevines, the product of a stock originally obtained from the Green Mountains, cannot be appropriated as a trade-mark. Canal Co. v. Clark, 13 Wall. 322, and Columbia Mill Co. v. Alcorn, 14 Sup. Ct. 151, 150 U. S. 460, followed.

3. SAME—ORGANIC ARTICLE.

The protection of a trade-mark cannot be obtained for an organic article, such as a species of grapevine, which, by the law of its nature, is reproductive, and derives its chief value from its innate vital powers, independent of the care or ingenuity of man.

Appeal from the Circuit Court of the United States for the District of New Jersey.

Rowland Cox, for appellants.
Augustus T. Gurlitz, for appellee.

Before ACHESON and DALLAS, Circuit Judges, and WALES, District Judge.

WALES, District Judge. James Hoyt and Edwin Hoyt sued the J. T. Lovett Company for the infringement of their common-law and registered trade-mark, under which they claimed the exclusive right to propagate and sell grapevines, grapevine slips, and grapes cultivated and produced by them, and to which they had given the name of "Green Mountain Grape." The circuit court dismissed the complainants' bill, on the ground that "the case seems clearly to fall within the principles stated by Mr. Justice Jackson in Mill Co. v. Alcorn, 150 U. S. 460, 14 Sup. Ct. 151, and is governed by it." In the case referred to the court says:

"The general principles of law applicable to trade-marks, and the conditions under which a party may establish an exclusive right to the use of a name or symbol, are well settled by the decisions of this court, * * * which * * * establish the following general propositions: * * * (3) That the exclusive right to the use of the mark or device claimed as a trademark is founded on priority of appropriation; that is to say, the claimant of the trade-mark must have been the first to use or employ the same on like articles of production. (4) Such trade-marks cannot consist of words in common use as designating locality, section, or region of country."

The law being thus settled, we have only to consider its application to the facts of the case now before us.

1. Priority of Adoption and Use. Each of the parties to the present suit has been for many years extensively engaged in the business of a nurseryman; the complainants at New Canaan, in the state of Connecticut, and the defendant at Little Silver, in the state of New Jersey. The bill alleges that the complainants, in and about the year

1885, discovered the vine to which, after three years of experimental cultivation and propagation, they gave the name of "Green Mountain Grape"; that they selected and used this name as a trade-mark in advance of all others, and have since continuously used it to denote and indicate their grapevines, and also the grape produced therefrom; that the said trade-mark was registered in the patent office of the United States on the 27th of August, 1889; and that the defendant has fraudulently used the same. The answer denies all the material matters set out in the bill, excepting the fact of registration, and specially denies that the complainants were the first to select and adopt the name which they claim as a trade-mark. The record shows that J. M. Paul, who carried on a nursery on a small scale at North Adams, Mass., in the year 1884, and probably earlier, found some grapevines growing wild on or near the side of the Green Mountains, in the state of Vermont, on the farm of Mr. Clough, from whom he bought them, and that in the spring of that year he sent one of the vines to Mr. Hathaway, of Easton, N. Y., with a wooden label attached thereto, bearing the words "Green Mountain." Previous to this Mr. Paul, while on a visit to the home of his old-time friend, Mr. Hathaway, had mentioned his discovery of the vines, and the two, after talking over the subject of a suitable name for the new vine, had concluded that "Green Mountain" "would cover the whole." The first vine planted by Mr. Hathaway did not live, and in the spring of 1885 he planted another of the same variety, labeled with the same name, received from Mr. Paul, which survived, and bore fruit in the summer of 1886; and from this last vine he sold eyes on slips to different buyers, among whom was the J. T. Lovett Company, by the name of the "Green Mountain Grape." This witness also states that he had sold and given away some of these vines to his neighbors as the Green Mountain grape, and that the vines are now known in his neighborhood by that name. Mr. Hathaway is distinct in his recollection of the circumstances thus briefly narrated, and he is corroborated as to the fact of prior use by other witnesses. Mr. Edwin Hoyt, one of the complainants, and the only witness produced in support of the bill, says that Mr. Paul sent them a sample of the Green Mountain grape in the spring of 1885; that they had at first thought of calling it the "New Canaan Grape," and had prepared a device, taken from a pictorial Bible, representing the two returning spies *bearing on their shoulders a staff from which was suspended a large* cluster of grapes, but upon further reflection "we thought the words 'Green Mountain,' the place where the vine originated, would carry with it the idea of hardiness; that, perhaps, the vine would take better; * * * and we finally adopted the name 'Green Mountain,' with the same picture"; and that this name has been used by them since January, 1889. Mr. Hoyt also states that the vine was discovered by Mr. Paul, who bought it of Clough. In a letter from the complainants to the defendant, dated September 11, 1888, they wrote: "We send you by express a sample of our new grape, the 'Green Mountain.' This grape originated in the Green Mountains; hence its name." The complainants published two advertisements, dated, re-

spectively, February, 1890, and August, 1890, in which, after describing the excellent qualities of their new grape, they notify the public that:

"Each vine sold will be sealed with our trade-mark. * * * Our copyright name, 'Green Mountain,' gives us the exclusive right for its propagation for sale."

On August 25, 1890, the defendant wrote to the complainants, inquiring:

"On what terms will you supply us some seals? A party offered us the wood of a vine of the Green Mountain grape last fall, which he said came into his possession before you had purchased. This was before we knew that you were going to have the grape copyrighted, and we bought the wood, and propagated from it a few vines, perhaps a hundred."

The complainants reply by letter to this inquiry, on August 27, 1890:

"You say you got the wood of a party who procured it before we had purchased it. We do not think this can be so, as we have had it nearly five years now, but did not offer it for sale until last spring a year ago. Would you object telling us from what source you received your wood? Mr. Paul told us there were no vines sold which would do us any harm. He is dead now, and there is no finding out to whom he sold vines, or the date he bought the vines from Mr. Clough."

At the time of the sale by Mr. Paul to the complainants,—December 20, 1885,—he entered into a written contract with them, the substance of which was that he would furnish the wood grown from the Green Mountain vine on his place, or under his control, so long as the said Hoyt's Sons shall require it, or until six years shall have expired; and without the latter's consent would not furnish the wood to any other person. It is quite probable that the complainants honestly believed they had acquired the sole right, under this agreement, to propagate and sell the vine, but they acted mistakenly, since the evidence proves that, besides Hathaway, at least two other persons—Mr. Terry and Mr. Francis—had each procured a Green Mountain vine from Mr. Paul, and had successfully cultivated them, before the complainants had decided to adopt "Green Mountain" as a trade-name. The registration of the trademark does not help the complainants. It amounts to nothing more than prima facie evidence of ownership, and does not confer a title upon the claimant, if some other person has, by adoption, acquired a prior right to its use. Manufacturing Co. v. Ludeling, 22 Fed. 826. In Canal Co. v. Clark, 13 Wall. 322, the court said:

"The office of a trade-mark is to point out distinctively the origin or ownership of the article to which it is affixed; or, in other words, to give notice who was the producer. This may, in many cases, be done by a name, a mark, or a device well known, but not previously applied to the same article."

The defendant is not charged with an attempt to palm off his goods as the goods of the complainants, nor is there any evidence that the defendant attempted to deceive the public by a counterfeit or any imitation of the latter's device. On this branch of the case the evidence appears to be conclusive that the complainants had

been anticipated in the use of the name which they undertook to claim as a trade-mark. We have not overlooked the contention of counsel that the prior use by Messrs. Hathaway, Terry, and Francis was not a commercial use, and was only for a short period before the registration. This distinction is unimportant in view of the fact that the name had already become extensively recognized and well known before the selection by complainants as descriptive of this particular variety of grape; and the length of time it had been on the market, if anterior, is not material. No usage or custom has been brought to our notice in support of the suggestion that the right of the public to the use of a name, as applied to a particular article, is limited by the number of sales, few or many, which may have been made previous to its adoption by a person who claims it as a trade-mark. It is not pretended that Mr. Hathaway was under any obligation which should have prevented him from selling the vines when he did; and one lawful prior sale by him, like Mercutio's wound, is enough.

2. The Right to the Use of a Geographical Name. This conclusion dispenses with anything more than a brief reference to the other defenses. The words "Green Mountain" being used to denote the place of origin of the article to which they were affixed, and the fact that this article is a natural product, bring the present case within the rule laid down in Canal Co. v. Clark and Mill Co. v. Alcorn, already cited. In the first of these cases the attempt was made to secure to the complainant the exclusive use of the name "Lackawanna Coal," as applied, not to any manufacture of theirs, but to that portion of the coal of the Lackawanna valley which they mined and sent to market, differing neither in nature nor quality from all other coal of the same region. The reasons why such use cannot be allowed are thus presented by Mr. Justice Strong, speaking for the court:

"No one can claim protection for the exclusive use of a trade-mark or trade-name which would practically give him a monopoly in the sale of any goods other than those produced or made by himself. If he could, the public would be injured, rather than protected; for competition would be destroyed. Nor can a generic name, or a name merely descriptive of an article of trade, of its qualities, ingredients, or characteristics, be employed as a trade-mark, and the exclusive use of it be entitled to a legal protection. * * * He has no right to appropriate a sign, or a symbol, which, from the nature of the fact it is used to signify, others may employ with equal truth, and therefore have an equal right to employ for the same purpose. And it is obvious that the same reasons which forbid the exclusive appropriation of generic names, or of those merely descriptive of the article manufactured, and which can be employed with truth by other manufacturers, apply with equal force to the appropriation of geographical names, designating districts of country. Their nature is such that they cannot point to the origin (personal origin) of the articles of trade to which they may be applied. * * * It must be considered as sound doctrine that no one can apply the name of a district of country to a well-known article of commerce, and obtain thereby such an exclusive right to the application as to prevent others inhabiting the district, or dealing in similar articles coming from the district, from truthfully using the same designation."

In Mill Co. v. Alcorn the court repeats and approves the rule thus laid down. Its application here is obvious. All the vines

which were sold or given away by Mr. Paul were the products of the orginal vine taken from the Green Mountains, and "hence its name." The vine planted by Mr. Hathaway, and the wood sold by him to the defendant, were reproductions of the parent stock, and both buyer and seller could rightfully use the name by which it had been first called. To have sold it under any other name would have been a deception on dealers in similar articles, who were entitled to know its pedigree and history. The name given to the vine and to the grape is geographical, designating a particular district or country, and cannot be employed by the complainants to the exclusion of others who deal in similar articles originating in the same locality.

3. The remaining objection to the bill is that the protection of a trade-mark cannot be obtained for an organic article which, by the law of its nature, is reproductive, and derives its chief value from its innate vital powers, independently of the care, management, or ingenuity of man. This question is conceded to be novel and unprecedented. Tested, however, by the general principles regulating sales of personal property, there is no doubt that a sale of seeds, plants, or vines, when detached from the soil in which they grew, carries with it, on delivery, the right of property in the buyer, not only in the article so bought, but also in the natural increase or products of the same when sown or replanted. Neither the common law nor the statutes relating to trade-marks extend the protection of trade-names to things which are valued more for their natural powers of reproduction and increase than for any other qualities. The facts in the present case afford an apt illustration of the incongruity of a contrary doctrine. A man buys a grapevine, to which is attached a metallic label stamped with the trade-mark of the seller. In the absence of a special contract between the parties, what is to prevent the buyer from cultivating the vine, and selling its products, whether of wood or of fruit, under the name of the parent stock? Certainly not a trade-mark. To repeat the words of Mr. Justice Strong:

"No one can obtain protection for the exclusive use of a trade-mark or trade-name which would practically give him a monopoly in the sale of goods other than those produced or made by himself."

The Hoyts did not make the Green Mountain vine, nor, strictly speaking, did they produce it. It grew out of the earth, was fashioned by nature, and endowed with powers and qualities which no human ingenuity or skill could create or imitate. If such protection as that now claimed by the complainants was allowed, a breeder of cattle could with equal propriety and reason demand like protection for the natural increase of his herd. In every aspect such claims would seem to be impracticable and inequitable. There was no error in the decree of the circuit court, and it is therefore affirmed.